ROBERT F. PURDY, ESQ.  (NV Bar No. 6097)
   robert.purdy@andrewleavittlaw.com
**LAW OFFICE OF ANDREW M. LEAVITT, ESQ.**
633 South 7th Street
Las Vegas, NV 89101
Telephone:     (702) 382-2800
Facsimile:     (702) 382-7438

DANIEL L. WARSHAW (Pro Hac Vice Forthcoming)
   dwarshaw@pwfirm.com
BOBBY POUYA (Pro Hac Vice Forthcoming)
   bpouya@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

Attorneys for Plaintiff and the Proposed Class

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA, SOUTHERN DIVISION

| | |
|---|---|
| RICHARD BEAUMONT,<br><br>             Plaintiff,<br><br>       v.<br><br>PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC.; CHESAPEAKE ENERGY CORPORATION; CONTINENTAL RESOURCES INC.; DIAMONDBACK ENERGY, INC.; EOG RESOURCES, INC.; HESS CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; and PIONEER NATURAL RESOURCES COMPANY,<br><br>             Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Plaintiff Richard Beaumont ("Plaintiff"), individually and on behalf of others similarly situated, bring this class action to recover damages and other appropriate relief under (i) the antitrust laws of the United States, and (ii) the various antitrust and consumer protection laws of states in the United States, and hereby allege, upon information and belief (unless otherwise notes) as follows:

## NATURE OF THE ACTION

1. This class action arises from a conspiracy among the largest U.S. shale oil producers to coordinate and constrain U.S. shale oil production, a conspiracy which has had the purpose and effect of fixing, raising, and maintaining the price of crude oil in and throughout the United States at supracompetitive levels, and which, as a direct result, has had the effect of increasing the price of home heating oil ("HHO").

2. Shale oil, also known as "tight oil," comprises nearly two-thirds of all crude oil produced onshore in the United States. Shale oil is extracted from sedimentary shale rock, and its extraction typically uses less conventional techniques, such as horizontal drilling and hydraulic fracturing (also known as "fracking").

3. Refineries purchase both shale and other crude oil extracted using other, traditional drilling methods. Those various oils go through the refining process after being mixed to produce petroleum-based products—including gasoline, diesel and HHO.

4. HHO and diesel fuel are virtually identical, except that HHO is dyed red to show its tax-free status. HHO is usually first transported to larger storage facilities, and then transported to smaller storage tanks for retail sale to end-use customers, who typically have their HHO delivered directly to their homes and businesses by truck.

5. Nearly 5 million households across the United States use HHO to heat their homes, with just over 80% of HHO households located in the Northeast.[1]

---

[1] United States Energy Information Administration ("EIA"), *Heating Oil Explained*, EIA.GOV, (April 19, 2023), https://www.eia.gov/energyexplained/heating-oil/use-of-heating-oil.php.



**Percentage of U.S. households that used heating oil by Census Region in winter of 2022-2023**

Total number of households that used heating oil = 4.96 million

6.      Because shale oil is the main ingredient used in the production of HHO, it is a key pricing component of HHO, and as such, a conspiracy to fix the price of crude oil is effectively a conspiracy to fix the price of HHO.

7.      The domestic market for shale oil production is dominated by independent producers ("independents") who primarily both (i) explore and develop shale resources, and (ii) produce shale oil in the United States. Defendants (defined below) are among the largest independents. Because of their ability to quickly modify shale oil production levels in response to changing global conditions that impact pricing, independents (including Defendants) have traditionally acted as so-called "swing producers," as described further below, important intermediary players in the global crude oil market.

8.      Before 2021, the "U.S. Shale Boom" driven by increasing volumes and efficiencies in producing shale oil helped keep crude oil prices stable and low.

9.      But in January 2021, crude oil prices in the United States began to increase significantly.

10.     Yet despite the rise in crude oil prices, and contrary to what industry analysts expected and economics would predict, Defendants collectively decided to not increase their

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   production of shale oil.

2       11.     As a result, around this time, crude oil prices and, in turn, HHO prices remained high.

3       12.     Defendants' collective decision to not increase shale oil production, which was

4   against their own independent economic interest, was made in connection with an agreement with

5   the Organization of the Petroleum Exporting Countries ("OPEC") who act to control the production

6   of much of the world's oil.

7       13.     OPEC is recognized as a multinational cartel comprised of thirteen oil-producing

8   nations who together manipulate global oil prices through the coordination of production levels

9   amongst its members. Indeed, OPEC meets regularly to set oil production targets and coordinate

10  production among each member nation, in order to control global oil prices.[2]

11      14.     From at least 2017 through 2023, Defendants and OPEC conducted regular meetings

12  and communications which facilitated the exchange of confidential production and capacity

13  information that allowed Defendants to coordinate their oil production levels. Defendants have

14  confirmed their involvement in candid discussions with OPEC regarding production strategies,

15  future investment plans, and price targets.

16      15.     For example, in February 2018, upon confirming a scheduled meeting between the

17  chief executives of U.S. shale oil companies and several OPEC officials, including OPEC's

18  Secretary General, the CEO of a domestic shale company said that U.S. shale oil producers "now

19  have a seat at the table on pricing."[3]

20      16.     About a year later, OPEC's Secretary General Mohammed Barkindo, after appearing

21  on a panel with Defendant Hess Oil's CEO John Hess, wrote in an OPEC bulletin, "We have to

22  continue to collaborate. It's one industry. It's a global industry, and I think our colleagues in the

---

25  [2] *What is OPEC+ and how it different from OPEC?*, EIA.GOV, (May 9, 2023),
26  https://www.eia.gov/todayinenergy/detail.php?id=56420.

27  [3] Alex Lawler and Ernest Scheyder, *OPEC to meet with U.S. shale firms in Houston on Monday: Sources*, REUTERS.COM, (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opec-usa-
28  idUSKCN1GB2KP/.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

CLASS ACTION COMPLAINT

U.S. are on the same page with us and we will work together to exchange views."[4]

17.     Recent global events, including the supply and demand disruptions related to the COVID-19 pandemic and the removal of most Russian oil from the global market following the invasion of Ukraine, has caused crude oil prices to increase dramatically. That increase created a ripe environment for swing producers like Defendants to quickly increase production and take advantage of the rising prices. Indeed, as Ali Nazar, Iraq's representative to OPEC noted in a 2018 speech in Berlin, "It's normal for shale oil, tight oil to increase in 2018 and *whenever oil prices support it*." (emphasis added).[5]

18.     But despite these events, the Defendants, breaking with precedent and acting against their respective unilateral self-interest, limited their U.S. shale oil production.

19.     Absent the conspiracy alleged herein, no economically rational independent would have acted in this manner.

20.     Defendants' conspiracy, which limited each of their respective shale oil production, had the purpose and effect of fixing, stabilizing, or maintaining crude oil prices—and, in turn, HHO prices—at artificially inflated levels throughout the United States during the Class Period.[6]

21.     The cartel formed by Defendants' conspiracy is a *per se* unlawful restraint of trade under not only federal antitrust law, but also under numerous state antitrust, unfair competition, and consumer protection laws. Plaintiff and the members of the proposed Classes[7] suffered substantial harm by virtue of the supracompetitive prices they paid for HHO as a direct and proximate result of

---

[4] Tom Christopher, *Trump blasted OPEC this past year. Hess CEO says the oil producer group deserves praise*, CNBC.COM (Jan. 23, 2019), https://www.cnbc.com/2019/01/23/trump-blasted-opec-hess-ceo-says-the-group-deserves-praise.html.

[5] Alex Lawler and Ernest Scheyder, *OPEC to meet with U.S. shale firms in Houston on Monday: Sources*, REUTERS.COM, (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opec-usa-idUSKCN1GB2KP/.

[6] The proposed Class Period is from January 1, 2021 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist. *See infra* pp. 42-43.

[7] The proposed Class is defined as all persons or entities who purchased, for their own use and not for resale, home heating oil in the United States (with a second proposed State Law Class made of residents of select states) during the Class Period. *See infra* pp. 42-43.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

the alleged cartel and its members' agreement to constrain U.S. shale oil production. Plaintiff brings this suit to recover those losses and to enjoin Defendants' conduct and to prevent Defendants from further harming Plaintiff and other HHO consumers.

## PARTIES

22.     Plaintiff Richard Beaumont is a citizen of Connecticut residing in Middletown, Connecticut. During the Class Period, Plaintiff Beaumont purchased home heating oil for his home, paying higher prices for those purchases as a result of the allegations alleged in this Complaint.

23.     Defendant Permian Resources Corporation ("PRC" or "Centennial") is a Delaware corporation with its principal place of business in Midland, Texas. It was formed in 2022 in a transaction between Colgate Energy Partners III, LLC and Centennial Resource Development, Inc. and, during the Class Period, conducted business and was primarily known as "Centennial." It is a major producer of crude oil from shale oil formations in New Mexico and Texas, which is refined into HHO and sold throughout the United States. PRC's common stock is listed on the New York Stock Exchange under the ticker symbol "PR."

24.     Defendant Chesapeake Energy Corporation ("Chesapeake") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. Chesapeake is a major producer of crude oil from shale oil formations, largely in Pennsylvania and Louisiana, which is refined into HHO and sold throughout the United States. Its common stock is listed on the NASDAQ Stock Market under the ticker symbols "CHK," "CHKEL," "CHKEW," and "CHKEZ."

25.     Defendant Continental Resources Inc. ("Continental") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. Continental is a major producer of crude oil from shale oil formations, largely in Oklahoma, Montana, North Dakota, Texas, and Wyoming, which is refined into HHO and sold throughout the United States. Its common stock is listed on the New York Stock Exchange under the ticker symbol "CLR."

26.     Defendant Diamondback Energy, Inc. ("Diamondback") is a Delaware corporation with its principal place of business in Midland, Texas. Diamondback is a major producer of crude oil from shale oil formations in Texas, which is refined into HHO and sold throughout the United States. Its common stock is listed on the NASDAQ Stock Market under the ticker symbol "FANG."

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

27. Defendant EOG Resources, Inc. ("EOG") is a Delaware corporation with its principal place of business in Houston, Texas. EOG is a major producer of crude oil from shale oil formations in Colorado, New Mexico, New York, North Dakota, Oklahoma, Pennsylvania, Texas, and Wyoming, which is refined into HHO and sold throughout the United States. Its common stock is listed on the New York Stock Exchange under the ticker symbol "EOG."

28. Defendant Hess Corporation ("Hess") is a Delaware corporation with its principal place of business in New York, New York. Hess is a major producer of crude oil from shale oil formations in North Dakota, which is refined into HHO and sold throughout the United States. Its common stock is listed on the New York Stock Exchange under the ticker symbol "HES."

29. Defendant Occidental Petroleum Corporation ("Occidental") is a Delaware corporation with its principal place of business in Houston, Texas. Occidental is a major producer of crude oil from shale oil formations in Colorado, New Mexico, and Texas, which is refined into HHO and sold throughout the United States. Its common stock and warrants are listed on the New York Stock Exchange under the ticker symbols "OXY" and "OXY WS," respectively.

30. Defendant Pioneer Natural Resources Company ("Pioneer") is a Delaware corporation with its principal place of business in Irving, Texas. Pioneer is a major producer of crude oil from shale oil formations in Texas, which is refined into HHO and sold throughout the United States. Its common stock is listed on the New York Stock Exchange under the ticker symbol "PDX."

31. The term "Defendants," as used herein, refers to and includes each of the named Defendants, as well as their predecessors, successors, parents, wholly owned or controlled subsidiaries or affiliates, employees, officers, or agents.

## AGENTS AND CO-CONSPIRATORS

32. Various co-conspirators, some known and some unknown, willingly participated in and acted in furtherance of the alleged conspiracy.

33. Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States that impacted the HHO market.

34. Defendants participated in the alleged conspiracy through the acts of their officers,

directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions—each and all for whom Defendants are liable.

35.    Whenever reference is made to an act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

## JURISDICTION AND VENUE

36.    This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act, *e.g.*, 28 U.S.C. § 1331 and 28 U.S.C. § 1337(a).

37.    Venue is because one or more of the Defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

38.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of five million dollars ($5,000,000), exclusive of interest and costs, there are more than one hundred (100) members in the proposed class, and Plaintiff is a citizen of Connecticut, and therefore diverse from at least one of the Defendants, all of whom are either incorporated in Delaware or Oklahoma and whom have their principal places of business in New York, Oklahoma, or Texas.

39.    This Court has personal jurisdiction over each Defendant because each Defendant or a subsidiary of each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of shale oil, used in the production of HHO, throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

40.     Defendants' activities were within the flow of, were intended to, and did have a substantial effect on interstate commerce in the United States. Defendants' products and services are sold through the stream of interstate commerce.

41.     By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff and the geographically dispersed class members. Defendants, directly and through their agents, engaged in activities affecting all states.

42.     Defendants' conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiff and members of the proposed Classes.

## **FACTUAL ALLEGATIONS**

**B.      The Organization of the Petroleum Exporting Countries ("OPEC") and Its Control Over Crude Oil Prices**

43.     Twelve member states currently[8] make up OPEC—, Algeria, Congo, Equatorial Guinea, Gabon, Iran, Iraq, Kuwait, Libya, Nigeria, Saudi Arabia, United Arab Emirates, and Venezuela.[9] OPEC's stated objective is to "coordinate and unify petroleum policies among its Member Countries;" and, it "is best known for its effect on global crude oil prices."[10] In other words, OPEC acts as an open and notorious cartel that manipulates global oil prices by coordinating production levels amongst its members.[11]

---

[8] A handful of OPEC members have, at times, suspended their membership, or withdrawn from the cartel. For example, Qatar terminated its membership in 2019. Likewise, Angola withdrew as of January 1, 2024. *Member Countries*, OPEC.ORG, https://www.opec.org/opec_web/en/about_us/25.htm (last accessed Feb. 3, 2024).

[9] *Heating Oil Explained*, EIA.GOV, (April 19, 2023), https://www.eia.gov/energyexplained/heating-oil/use-of-heating-oil.php.

[10] *Id.*

[11] Anshu Siripurapu and Andrew Chatzky, *OPEC in a Changing World*, COUNCIL ON FOREIGN RELATIONS, (March 9, 2022), https://www.cfr.org/backgrounder/opec-changing-world.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1

**Figure 1: OPEC Share of World Crude Oil Reserves (by member), 2022**[12]



13    44.    Because of its dominant market position, OPEC has historically been able to exert

14 market power over global crude oil prices simply by coordinating its members' respective

15 production levels. Each American President since the 1970's has described OPEC as a threat to the

16 U.S. economy because of its market power.[13]

17    45.    Historically, Saudi Arabia had acted as a swing producer—*i.e.*, a producer able to

18 rapidly increase crude oil production levels in response to changing market conditions.[14] But Saudi

19 Arabia's leading role in that position began to change with the emergence of the U.S. shale oil

20 industry.[15]

[12] *OPEC Annual Statistical Bulletin 2023*, OPEC, https://www.opec.org/opec_web/en/data_graphs/330.htm (last accessed Feb. 8, 2024).

[13] Anshu Siripurapu and Andrew Chatzky, *OPEC in a Changing World*, COUNCIL ON FOREIGN RELATIONS, (March 9, 2022), https://www.cfr.org/backgrounder/opec-changing-world.

[14] Mohamed El-Erian, *Saudi Arabia Is Swinging Again – But for How Long?*, PROJECT SYNDICATE, (June 7, 2022), https://www.project-syndicate.org/commentary/oil-market-saudi-arabia-swing-producer-role-by-mohamed-a-el-erian-2022-06.

[15] Thomas Duesterberg, *US Needs to Play Larger Role as Swing Producer of Oil and Gas in the Current Crisis*, HUDSON INSTITUTE, (Nov. 11, 2022), https://www.hudson.org/energy/us-larger-

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

46.     So, in late 2016, in response to the massive impact U.S. shale oil was having on the global crude oil market, OPEC signed an agreement with 10 other oil-producing countries to create OPEC+.[16] The OPEC+ countries include Azerbaijan, Kingdom of Bahrain, Brunei Darussalam, Kazakhstan, Malaysia, Mexico, Sultanate of Oman, the Russian Federation, Republic of Sudan, and Republic of South Sudan.[17] OPEC and OPEC+ counties together account for about 59% of global oil production.[18]

**Figure 2: Total Oil Production from OPEC+ by Member, 2022**



C.     **United States Shale Oil Production**

47.     For years, oil producers had attempted to extract oil from shale deposits in an economically feasible manner. Finally, in 2008, the combination of horizonal drilling and hydraulic

role-swing-producer-oil-natural-gas-crisis.

[16] *What is OPEC+ and how it different from OPEC?*, EIA.GOV, (May 9, 2023), https://www.eia.gov/todayinenergy/detail.php?id=56420.

[17] *Declaration of Cooperation: OPEC and non-OPEC*, OPEC, (Dec. 10, 2016 – Nov. 30, 2017), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/Declaration%20of%20Cooperation.pdf.

[18] *What is OPEC+ and how it different from OPEC?*, EIA.GOV, (May 9, 2023), https://www.eia.gov/todayinenergy/detail.php?id=56420.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

fracking techniques made extraction from those deposits more profitable and resulted "in one of the greatest oil booms the world had ever seen."[19] In fact, between 2008 and 2015, the U.S. saw its fastest increase in oil production capacity in history, reversing a 35-year trend of declining oil production.[20]

48.     As recently as 2015, OPEC, "assum[ed] that shale production would no longer be economically viable" after OPEC decided and acted to drive crude oil prices down.[21] But technological advancements in shale extraction continued and allowed domestic shale producers to continue to tap into previously trapped oil deposits at decreasing costs.

49.     As a result, the smaller, independent U.S. shale oil producers had the previously unprecedented ability to challenge OPEC's control of crude oil prices. The key was the independents' ability, within months of crude oil reaching economically viable (*i.e.*, "breakeven") price levels, to ramp up production of shale oil to take advantage of higher oil prices. These independents could quickly supply oil to the market whenever OPEC implemented production limits, essentially "free riding" on OPEC's actions as a cartel to extract higher price (*i.e.* monopoly rents) by constraining crude oil supplies.

50.     Moreover, unlike OPEC member countries (who purport to benefit from sovereign immunity to the Sherman Act), these U.S. independent shale oil producers, are subject to U.S. antitrust laws and do not have legal justification to coordinate production levels and prices like the OPEC cartel. Instead, these independents should have, and seemingly for a time were, forced to compete with one another, resulting in lower prices not only for crude oil, but also its derivative petroleum products, like HHO.

---

[19] Robert Rapier, *How the Fracking Revolution Broke OPEC's Hold on Oil Prices*, FORBES, (July 22, 2018), https://www.forbes.com/sites/rrapier/2018/07/22/how-the-fracking-revolution-broke-opecs-hold-on-oil-prices/?sh=e308dc648efd.

[20] Robert Rapier, *How the Shale Boom Turned the World Upside Down*, FORBES, (April 21, 2017), https://www.forbes.com/sites/rrapier/2017/04/21/how-the-shale-boom-turned-the-world-upside-down/.

[21] Anshu Siripurapu and Andrew Chatzky, *OPEC in a Changing World*, COUNCIL ON FOREIGN RELATIONS, (March 9, 2022), https://www.cfr.org/backgrounder/opec-changing-world.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

51.     All of these events, ushered in an American Oil Boom, dubbed "Cowboyistan," between approximately 2010 and 2015,[22] and a "new oil order" emerged wherein aggressive competition from independents (domestic shale producers) usurped Saudi Arabia's role as the key swing producer, and thus eroding OPEC's ability as a cartel to set crude oil prices.

**D.     2014-2016: The OPEC Price War**

52.     OPEC member nations refused to willingly cede this loss in control over global crude oil prices to United States shale oil producers. Instead, OPEC decided to leverage its control over the cheapest-to-produce oil in the world to drive the more expensively produced shale oil from the United States out of the market.

53.     In the middle of 2014, OPEC made the strategic, long-term decision to push crude oil prices to a level just low enough so as to render U.S. shale oil production no longer economically viable. This marked the beginning of a two-year period known as the "OPEC Price War," during which period, as both OPEC member nations and U.S. shale oil producers flooded the market with crude oil at levels not seen in decades, the price of crude oil plummeted—as reflected in the following graph:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[22] Christopher Helman, *Welcome to Cowboyistan: Fracking King Harold Hamm's Plan for U.S. Domination of Global Oil*, FORBES, (Mar. 9, 2015), https://www.forbes.com/sites/christopherhelman/2015/03/09/welcome-to-cowboyistan-fracking-king-harold-hamms-plan-for-u-s-domination-of-global-oil/.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**Figure 3: Crude Oil Prices – 70 Year Historical Chart**[23]



54.     And as a direct consequence of HHO prices being driven by crude oil prices, during that same period, prices for HHO also plummeted, as reflected in the following graph:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

_____

[23] *Crude Oil Prices – 70 Year Historical Chart*, MACROTRENDS.NET, https://www.macrotrends.net/1369/crude-oil-price-history-chart (last accessed Feb. 5, 2024).

**Figure 4: Heating Oil Prices – 70 Year Historical Chart**[24]



55.     Despite OPEC's best efforts to price them out of business, U.S. shale oil producers persisted. As crude oil prices dropped, shale oil producers managed to find ways to cut costs and increase productivity, driving breakeven points—*i.e.*, the price at which it still makes sent to continue drilling—lower and lower. At the start of the OPEC Price War in 2014, the breakeven point was $82/barrel; by 2018, the breakeven price was $47/barrel; and by 2021, the breakeven price was $37/barrel.[25]

56.     By implementing these cost-cutting measures and focusing on the most productive shale oil opportunities, U.S. shale oil producers were able to remain competitive even in the lower-

---

[24] *Heating Oil Prices – 70 Year Historical Chart*, Macrotrends.net, https://www.macrotrends.net/2479/heating-oil-prices-historical-chart-data (last accessed Feb. 2, 2024).

[25] *Rystad Energy: As Falling Costs Make New Oil Cheaper to Produce, Climate Policies May Fail Unless they Target Demand*, Russia Oil & Gas Magazine, (Nov. 17, 2021), https://www.rogtecmagazine.com/rystad-energy-as-falling-costs-make-new-oil-cheaper-to-produce-climate-policies-may-fail-unless-they-target-demand/.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

price environment. Thus, many U.S. shale oil producers—including Defendants—continued to keep their production levels up, despite the lower prices caused by the OPEC Price War.

57.     Knowing that OPEC member nations, whose economies heavily rely on oil revenues, were similarly hurting, U.S. shale oil producers remained at the ready, increasing production whenever prices improved. For example, as Defendant Pioneer's CEO explained in 2016, U.S. shale oil producers were ready to ramp up production whenever oil prices moved above $60/barrel.[26]

58.     However, during this time, some smaller players in the U.S. shale oil industry could not survive the low prices and were either driven out of business or merged with larger independents. Thus, the OPEC Price War did not kill the U.S. shale oil industry, but instead served to consolidate it.

**E.     2016-2019: OPEC+ and Defendants Start to Communicate with OPEC**

59.     In response to its loss influence to the U.S. shale oil producers, OPEC took two decisive actions. First, OPEC created OPEC+, a new group consisting of the original OPEC nations and 10 additional member nations, including 3-largest global producer Russia, increasing OPEC's overall market share. Second, OPEC initiated a multi-year campaign work with, and not against, U.S. shale oil producers.

60.     And U.S. shale oil producers proved themselves open to the idea of joining a cartel. For example, as reported by MarketWatch on September 8, 2016, Defendant Continental's CEO, Harold Hamm, said it was "'high time' for Russia and [OPEC] to forge a pact that would put an end to [the] slide in crude oil prices," further adding that "major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later."[27] Such comments signaled that U.S. shale oil producers were ready and willing to collude, rather than compete, with OPEC.

61.     Shortly thereafter, in early 2017, Defendants and members of OPEC began having

---

[26] Steven Mufson, *Is The Oil World Big Enough for Two Swing Producers?* WASH. POST, (Sept. 29, 2016), https://www.washingtonpost.com/business/economy/is-the-oil-world-big-enough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3ef-f35afb41797f_story.html.

[27] Mark DeCambre, *Harold Hamm Says it is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH.COM, (Sept. 8, 2016), https://www.marketwatch.com/story/trumps-potential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

meetings and dinners together, including at industry meetings such as the CERAWeek Conference, an event for energy producers that is held annually in Houston, Texas.[28] During that conference, held March 6-10, "[OPEC's General Secretary] Barkindo dined with about two dozen U.S. shale executives," including Scott Sheffield of Defendant Pioneer, Hess of Defendant Hess, Doug Lawler of Defendant Chesapeake, and Tim Leach of Concho Resources Inc.[29] That "unusual 2017 dinner gathering opened a communication channel between the shale companies and OPEC countries."[30]

62.     Also, on March 7, 2017, Sheffield of Defendant Pioneer told Bloomberg that, "I'm seeing a series of meetings where OPEC is reaching out and spending more time with U.S. independents than I've seen over my entire career. I think the new thought process within OPEC is that there are other places around the world that can supply crude around the world, and they want to definitely have an understanding of how fast it can come on."[31] Sheffield also admitted that he attended a so-called "Dinner Détente" which he described as an event where "[OPEC's] trying to understand our business model" and further indicated that "I think they're trying to understand more about our ability to produce, what the cost structure is and what's going to happen over the next several years."[32] And Sheffield further added that, "[i]n return, shale producers are talking with OPEC to learn about the members' thought process towards the price of oil over the next several years, what supplies the different members have themselves, and whether inventories are falling."[33]

---

[28] Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in No Rush to Resume Price War*, REUTERS, (March 10, 2022), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10/.

[29] Javiar Blas and Grant Smith, *OPEC Head to Meet U.S. Shale Oil Producers for Dinner Next Week*, WORLD OIL, (Feb. 27, 2018), https://www.worldoil.com/news/2018/2/27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week/.

[30] *Id.*

[31] David Wethe, *Oil to Hit $40 If OPEC Fails to Expand Cuts, Pioneer Says,* BLOOMBERG, (March 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-if-opec-doesn-t-extend-cuts.

[32] *Id.*

[33] *Id.*

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

According to Sheffield, "[this] helps us plan long term."[34]

63.     In another article describing that same dinner meeting, according to the attendees, "[t]he sides agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone."[35] Attendees further said that "while the shale producers signaled they weren't ready to give up on the growth they see ahead, OPEC indicated it wants higher prices, even if it means enriching the shale companies."[36] According to Defendant Hess's CEO, "It was a very good exchange of information and views about oil. … It was a good talk."[37]

64.     So, as the participants of this meeting themselves readily acknowledged, U.S. shale oil producers not only shared competitively sensitive, forward-looking information concerning both production levels and pricing with OPEC, but they expressly agreed to reduce crude oil supplies.

65.     Then, shortly after that 2017 CERAWeek meeting, Saudi Arabia's Energy Minister Khalid Al-Falih told U.S. shale oil producers that there would be no "free rides," and they too needed to be ready to pull their weight when the time comes.[38] OPEC was telling domestic shale producers that they all needed to coordinate production.

66.     And later that year, OPEC Secretary General Barkindo admitted to reporters that U.S. shale oil producers were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner."[39]  Barkindo explained that he understood, from a meeting with

---

[34] *Id.*

[35] Javiar Blas, *OPEC Said to Break Bread With Shale in Rare Show of Détente*, Bloomberg, (March 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente.

[36] Javiar Blas, *OPEC Said to Break Bread With Shale in Rare Show of Détente*, Bloomberg, (March 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente.

[37] *Id.*

[38] Ron Bousso, *Exclusive – Saudis Tell U.S. Oil: OPEC Won't Extend Cuts to Offset Shale – sources*, Reuters, (March 9, 2017), https://www.reuters.com/article/idUSKBN16G2TQ/.

[39] *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, Financial Times, (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

executives of Defendants Hess and Continental during the CERAWeek Conference, that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[40]

67.     In March 2018, just before that year's CERAWeek Conference, OPEC Secretary General Barkindo, discussing another scheduled dinner with domestic shale producers, explained "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek,"[41] and further indicated that this second annual dinner at the CERAWeek Conference was arranged to "further explore the mechanic of achieving our common objective."[42]

68.     That dinner took place on March 5, 2018 at the Grove restaurant in Houston, Texas.[43] And during that dinner, OPEC Secretary General Barkindo gave a speech that Defendant Pioneer's CEO, Timothy Dove, later described as follows: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth."[44] Defendant Centennial's CEO, Mark Papa, also in attendance characterized the speech as "a statement that everyone will work together to make sure the oil market is well-supplied and everyone is happy to be working together."[45]

69.     OPEC representatives also described the dinner as an exchange of forward-looking information. OPEC Secretary General Barkindo reported that he and U.S. shale oil executives "had a very open, frank and lively conversations on a current state of the cycle and we also compared

---

[40] *Id.*

[41] Javiar Blas and Grant Smith, *OPEC Head to Meet U.S. Shale Producers for Dinner Next Week*, BLOOMBERG, (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week.

[42] *Id.*

[43] Earnest Scheyder and Ron Bousso, *U.S. Shale and OPEC Share Steam in Uneasy Truce at Houston Dinner*, REUTERS, (March 6, 2018), https://www.reuters.com/article/us-ceraweek-energy-opec-shale-idUSKCN1GJ04H/.

[44] *Id.*

[45] *Id.*

note[s] from our experiences during these cycles, how we should proceed going forward. I was very surprised by the high-level of turnout, as well as the interest they have shown in continuing this energy dialogue."[46]

70.      Equatorial Guinea's petroleum minister, Gabriel Mgaga Obiang Lima, told reporters: "The key thing is that information is shared about our projections; it really helps everybody…the important thing is to know how much they [U.S. shale oil producers] are investing and their projections because usually they have good statistics."[47] Lima then revealed the true purpose behind this information exchange: "What we are doing is avoiding volatility," he said—or, put differently, stabilizing prices by coordinating production.[48]

71.      A CEO of a U.S. shale oil producer, who declined to be identified by name, told reporters, "Shale has dramatically changed the world's perception of fossil fuels…. We now have a seat at the table on pricing."[49]

72.      By June 2018, Defendants began taking a more conciliatory approach with OPEC.

73.      Defendant Continental's CEO Hamm attended a board meeting of Saudi Aramco, agreed to speak at an OPEC event, and reportedly began "asking fellow shale producers to focus more on profitability and less on profligate production."[50]

74.      Also in June 2018, OPEC Secretary General Barkindo invited domestic shale

---

[46] *OPEC Bulletin*, OPEC, at 51, (Feb. 2019), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf.

[47] Patti Domm, *OPEC Wants to Take its Relationship with US Shale Producers to the Next Level*, CNBC.COM, (March 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-with-us-shale-producers-to-the-next-level.html.

[48] *Id.*

[49] Alex Lawler and Ernest Scheyder, *OPEC to meet with U.S. shale firms in Houston on Monday: Sources*, REUTERS.COM, (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opec-usa-idUSKCN1GB2KP/.

[50] Ernest Scheyder, *Continental Resources CEO Harold Hamm Pulls Out of OPEC Meeting*, REUTERS, (June 18, 2018), https://www.reuters.com/article/us-oil-opec-contl-resources-idUSKBN1JE1VW/.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

officials to join him at the OPEC International Seminar in Vienna, Austria. Executives from at least two Defendants attended—Defendant Pioneer's Sheffield and Defendant Hess's Hess—during which Sheffield said: "OPEC should boost daily output by roughly 1 million barrels over time" and "[t]hey [OPEC] need to put together some kind of deal to phase into the market. None of us want $80 to $100 [per barrel] oil, that's too high. There's a sweet spot between $60 and $80."[51] Sheffield then added: "OPEC needs to fulfill its duty."[52]

75. In connection with the same OPEC summit, Defendants admitted to actively participating in, rather than just listening to, what was said during their meetings with OPEC. Defendant Pioneer's Sheffield said: "My message yesterday as I spoke to the [OPEC] panel was that it's important that OPEC increases production somewhat to make up for the difference. If they don't, we are going to see $100 oil or higher."[53]

76. And Sheffield's message was apparently heard—two days before OPEC's June 22, 2018 production negotiation, Sheffield predicted to Bloomberg the exact amount of OPEC's production change.[54]

77. In January 2019, OPEC's Secretary General Barkindo, Defendant Hess's CEO Hess, and Defendant Occidental's CEO Vicki Hollub sat together on a panel at the Davos World Economic Forum where it was reported that both Hess and Hollub "said that growth of U.S. shale oil output would slow" in the near future and Barkindo, in turn, expressed a desire "to talk more regularly to U.S. producers to understand their industry better even if they could not participate in any OPEC-

---

[51] Ernest Scheyder, *U.S. Shale Executive Pushes OPEC to Gradually Boost Output*, REUTERS, (June 20, 2018), https://www.reuters.com/article/idUSKBN1JG2OA/.

[52] *Id*.

[53] *Pioneer Chairman Sees an OPEC Increase of up to 600,000 B/D*, BLOOMBERG, (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.

[54] *Id*; *See also*, Rania El Gamal, et al., *OPEC Agrees Modest Hike in Oil Supply After Saudi and Iran Compromise*, REUTERS, (June 22, 2018), https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supply-after-saudi-and-iran-compromise-idUSKBN1JI0OG/.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

led production cuts."[55] Hess responded by saying "OPEC plays a very important role in stabilizing the market and those efforts need to be recognized," to which Barkindo responded: "We have to continue to collaborate. It's one industry. It's a global industry, and I think our colleagues in the U.S. are on the same page with us and we will work together to exchange views."[56]

78. That same month, OPEC+ began new production cuts, agreeing to reduce supply by 1.2 million barrels per day over the next six months.[57] After those cuts were announced, "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing."[58]

79. In March 2019, U.S. shale oil executives (including from Defendants) and OPEC met for a third time in three years at CERAWeek— "[t]he event ha[d] become an informal communication channel between the cartel and fast-growing shale producers."[59]

80. Once again, U.S. shale oil executives—including Defendant Diamondback's CEO Travis Stice, Defendant Centennial's CEO Papa, and Defendant Occidental's CEO Hollub—met with OPEC's Secretary General Barkindo for a dinner meeting during that CERAWeek conference.[60] Barkindo described the dinner as a "friendly conversation on current industry issues

---

[55] Dmitry Zhdannikov, *U.S. Oil Firms Tell OPEC Their Growth Will Slow*, REUTERS, (Jan. 23, 2019), https://www.reuters.com/article/uk-davos-meeting-opec-usa-idUKKCN1PH1TG/.

[56] Tom Christopher, *Trump Blasted OPEC This Past Year. Hess CEO Says the Oil Producer Group Deserves Praise*, CNBC.COM (Jan. 23, 2019), https://www.cnbc.com/2019/01/23/trump-blasted-opec-hess-ceo-says-the-group-deserves-praise.html.

[57] Alex Lawler, *OPEC Posts First 2019 Oil-Output Rise Despite Saudi Cuts*, REUTERS, (Aug. 30, 2019), https://www.reuters.com/article/us-oil-opec-survey-idUSKCN1VK1YD/.

[58] Jennifer Hiller, *U.S. Shale Producers See OPEC Pullback Helping 2019 Profits*, REUTERS, (Dec. 8, 2018), https://www.reuters.com/article/idUSL1N1YC20I/.

[59] Javier Blas, *Rick Perry Sees Venezuelan Crude Crisis Worsenig: CERAWeek Update*, BLOOMBERG, (March 11, 2019), https://www.bloomberg.com/news/articles/2019-03-11/venezuelan-oil-output-is-plunging-iea-says-ceraweek-update.

[60] Javier Blas and Rachel Adams-Heard, *OPEC Splits Avocado Appetizer With Shale Adversaries in Texas*, BLOOMBERG, (March 11, 2019), https://www.bloomberg.com/news/articles/2019-03-11/opec-to-break-bread-with-shale-rivals-in-houston-for-3rd-year (last accessed 1/31/24).

and the immediate prospects and challenges for all," while Stice told reporters that OPEC and attending shale oil executives had "a very good session" which included "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."[61]

### F.    2021: Defendants Agree to Restrict Production of Shale Oil

81.    According to industry analysts, 2019 was slated bring "[t]he second wave of the U.S. Shale revolution," which would have been significant for OPEC because "U.S. oil output [wa]s expected to grow by 1.4. million barrels a day [in 2019], to average 12.4 million barrels a day."[62]

82.    But that "second wave" never came. Starting in early 2020, COVID-19 caused demand for crude oil to reach lows never seen before.

83.    Then, in July 2020, OPEC's Secretary General explained that OPEC could inflate and sustain crude prices if Defendants cooperated:

> We were able to reach out to the U.S. independents and we had established a line of communication with them. We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers. There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. Everybody has a role to play. We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry.[63]

84.    And on November 28, 2020, Defendant EOG's CEO Bill Thomas signaled the domestic shale industry's willingness to listen to OPEC and not increase shale oil production and seek market share when economic self-interest should have led them to do precisely that: "In the

---

[61] Javier Blas and Rachel Adams-Heard, *OPEC Splits Avocado Appetizer With Shale Adversaries in Texas*, BLOOMBERG, (March 11, 2019), https://www.bloomberg.com/news/articles/2019-03-11/opec-to-break-bread-with-shale-rivals-in-houston-for-3rd-year (last accessed 1/31/24).

[62] *Id.*

[63] *OPEC Secretary General: No Objective to Drive US Shale Out of Business*, OIL & GAS J., (July 9, 2020), https://www.ogj.com/general-interest/article/14179258/opec-secretary-general-no-objective-to-drive-us-shale-out-of-business.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

future, certainly we believe OPEC will be the swing producer—really, totally in control of oil prices. We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices."[64]

85.    So, in early 2021, when the world was emerging from the pandemic, and demand for crude oil surged, causing prices to rise to nearly $70/barrel in March 2021, in order to prop up prices, OPEC and OPEC+ countries agreed to limit production of crude oil.[65]

86.    And Defendants, consistent with the assurances provided by Defendant EOG's CEO Thomas, responded not by increasing production and taking market share, but instead by also limiting production. Suddenly, and nearly in unison, the domestic shale-producing Defendants not only slowed down their production, but they also began making public statements touting the need for supply "discipline."

87.    Throughout 2021, Defendants consistently signaled to each other and to OPEC (and OPEC+) that they were no longer competing for market share, and that they would not act as profit-seeking swing producers:

(a) February 2021:

- Defendant Chesapeake's CEO Lawler announced that U.S. shale oil producers were entering a "new era" that would require "a different mindset" with "more discipline and responsibility."[66]

- Defendant Pioneer's CEO Sheffield agreed and predicted that small companies (*i.e.*, those not included in the independents' discussions with

---

[64] Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, BLOOMBERG, (Nov. 28, 2020), https://www.bloomberg.com/news/articles/2020-11-28/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands.

[65] Charles Riley, *Oil Prices Surge as OPEC and its Allies Extend Production Cuts*, CNN.COM, (March 4, 2021), https://www.cnn.com/2021/03/04/investing/opec-oil-prices-saudi-russia/index.html.

[66] Alex Lawler and Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS, (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  OPEC) would increase production so as to take advantage of rising oil prices,

2  but that major companies (*i.e.*, those who were included in the independents'

3  discussions with OPEC) would not do so, such that, in the aggregate,

4  domestic production would "remain flat to 1% higher," even if crude prices

5  exceeded $60/barrel—the level at which "any oil production [wa]s

6  profitable," including the "relatively high-cost U.S. shale patch."[67]

7  (b) March 2021:

8  • On March 4, 2021, the same day that OPEC publicly announced that it would

9  be restricting supply, Defendant Occidental's CEO Hollub said that despite a

10  "healthier supply and demand environment" and a "V-shaped" post-

11  pandemic recovery, domestic oil production would not resume to pre-

12  pandemic levels because Defendants and other U.S. shale oil producers were

13  together "committed to value growth, rather than production growth."[68]

14  (c) April 2021:

15  • Defendant Pioneer's CEO Sheffield signaled to the market, saying: "OPEC

16  and Russia were upset that we grew too much…. If we ever start growing

17  again too much, we're going to have another price war."[69] Sheffield was

18  "totally against" an industry forecast for substantial production growth

19  because "producers now know the stakes and will stick to their mantra of

20

21

22

23  [67] Alex Lawler and Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, Reuters, (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/.

24

25  [68] Pippa Stevens, *U.S. Oil Production Won't Return to Pre-Pandemic Levels, says Occidental CEO*, CNBC.COM, (March 4, 2021), https://www.cnbc.com/2021/03/04/us-oil-production-wont-return-to-pre-pandemic-levels-occidental-ceo.html.

26

27  [69] Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE.COM, (April 14, 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.

28

capital discipline."[70]

(d) June 2021:

- Defendant Pioneer's CEO Sheffield said that he was "confident the producers will not respond" the high crude oil prices by increasing production.[71]

(e) August 2021:

- On an earnings call, Defendant EOG's President and CEO Thomas—echoing Defendant Chesapeake's CEO Lawler's language from earlier in the year, referenced a "new era" of collaboration in the global crude oil market with a "more positive macro environment than we've been in since really the shale business started. I think OPEC+ is solid. I think the U.S. will remain disciplined. And so, I think the industry is in for a long run of really good results."[72]

(f) October 2021:

- Defendant Pioneer's CEO Sheffield said domestic producers were not willing to increase supply and take market share to generate profits, instead explaining that the soaring crude oil prices were "under OPEC control."[73] He also promised to cap any Pioneer 's production increase at 5% per year, regardless of the price of crude oil, explaining that "everybody's going to be

---

[70] Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE.COM, (April 14, 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.

[71] Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jumps,* REUTERS, (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28/.

[72] *EOG Resources (EOG) Q2 2021 Earnings Call Transcript*, THE MOTLEY FOOL, (Aug. 5, 2021), https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-call-transcript/.

[73] *US Shale Drillers Cannot Contain Oil Price Rise, Pioneer Boss Says*, FINANCIAL TIMES, (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

disciplined, regardless whether it's $75 Brent, $80 Brent, or $100 Brent."[74]

88.     Considering that the breakeven prices for U.S. shale oil production at that time were approximately $40/barrel, Defendants' "discipline" and "restraint" raised the eyebrows of industry analysts:

(g) January 2021:

- Reuters reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles," and that the recent "run up in crude prices, and oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom."[75]

(h) June 2021:

- A Reuters columnist noted that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel," but that Defendants' production restraints have "emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices. Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts and investors."[76] The columnist also observed that "there is a broad consensus among OPEC+ countries and the U.S. shale industry on the need for slower output growth, higher prices, and wider profit margins."[77]

---

[74] *US Shale Drillers Cannot Contain Oil Price Rise, Pioneer Boss Says*, FINANCIAL TIMES, (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05.

[75] Liz Hampton, *U.S. Shale Industry Tempers Output Even As Oil Price Jumps*, REUTERS, (June 28, 2021) https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28/.

[76] *Id.*

[77] Liz Hampton, *U.S. Shale Industry Tempers Output Even As Oil Price Jumps*, REUTERS, (June

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

(i)  February 2022:

- On Defendant Chesapeake's Q4 2021 earnings call, Bank of America Managing Director and Head of U.S. Oil and Gas challenged Defendant Chesapeake's plans to slow production, calling that plan "the easiest way to destroy value" for the company in the long term."[78]

89.     OPEC knew what was happening. In early 2021, OPEC predicted a significant annual drop in domestic shale production, and an anonymous OPEC sources confirmed "[t]he lack of a shale rebound could make it easier for OPEC and its allies to manage the market."[79]

90.     OPEC Secretary General Barkindo similarly signaled that the price war was over, stating: "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market" and that independents and OPEC "have a shared responsibility in this regard."[80]

**G.     2022-2023: Defendants Continue to Limit Production**

91.     In 2022, following Russia's February invasion of Ukraine, crude oil prices spiked. Contrary to the dramatic drop in demand caused by COVID-19, this upwards price spike was a supply-side phenomenon caused by the sudden decrease in the volume of available oil in the domestic market.

92.     By the middle of 2022, the price of oil rose to more than $120/barrel.

93.     In response to the possibility that higher prices might recede, OPEC cut production even further, including by two million barrels per day in October 2022. OPEC announced these cuts at the same time that crude oil prices began to normalize, saying that the cuts were designed to

---

28, 2021) https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28/.

[78] *Chesapeake Energy Corporation (CHK) CEO Nick Dell'Osso on Q4 2021 Results – Earnings Call Transcript*, SEEKING ALPHA, (Feb. 24, 2022), https://seekingalpha.com/article/4489980-chesapeake-energy-corporation-chk-ceo-nick-dellosso-on-q4-2021-results-earnings-call.

[79] Alex Lawler and Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS, (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/.

[80] *Id.*

"stabilize the recent fall in global energy prices."[81]

94.     Despite these record high prices, which remained high through 2023, Defendants continued to act against their rational economic self-interest by continuing to limit shale oil production:

(j)   February 2022:

- As Russia prepared for its Ukraine invasion, Defendant Pioneer's CEO Sheffield publicly stated: "In regards to the industry, it's been interesting watching some of the announcements so far, the public[ly listed] independents are staying in line," and "I'm confident they will continue to stay in line."[82]

- Defendant Pioneer's CEO Sheffield told a Bloomberg television reporter: "Whether it's $150 oil, $200 oil, or $100 oil, we're not going to change our growth plans."[83]

(k)   February 2022:

- Defendant Continental's CEO Bill Berry said on the company's Q4 earnings call: "We project generating flat to 5% annual production growth over the next five years as we have previously noted."[84]

(l)   February 2022:

[81] Jeff Stein, et al., *OPEC, Allies Move to Slash Oil Production, Eliciting Blistering White House Response*, WASH. POST, (Oct. 5, 2022), https://www.washingtonpost.com/business/2022/10/05/opec-plus-oil-cut-russia-saudi-arabia/.

[82] Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM, (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-Shale-Giants-Drill-Aggressively.html.

[83] *Id.*

[84] Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM, (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-Shale-Giants-Drill-Aggressively.html.

CLASS ACTION COMPLAINT

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

- Bloomberg reported that "[Defendant]EOG Resources Inc. plans to restrain oil growth despite surging prices, falling into line with most other major U.S. independent shale producers…like [Defendant] Pioneer National Resources and [Defendant] Continental Resources [, what] are also limiting increases to 5% this year."[85]

(m) March 2022:

- Defendant Occidental's CEO Hollub said that the company had a "huge inventory of high-quality investments," but that it was not using those investments because it was "instead focused on maintaining high profits."[86]

(n) August 2022:

- During an earnings call, Defendant EOG said that, despite the economic conditions, the company planned to limit its 2023 production growth to "low single digits" because it was "committed to remaining disciplined."[87]

(o) January 2023:

- Defendant Pioneer's Sheffield said that the "aggressive growth era of US shale is over" and that U.S. shale oil producers were "no longer a swing producer."[88]

/ / /

---

[85] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG, (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers.

[86] Pippa Stevens, *Oil Producers In a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC.COM, (March 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html.

[87] Liz Hampton, *U.S. Shale Producer EOG Sticks to 4% Annual Output Growth*, REUTERS, (Aug. 5, 2022), https://www.reuters.com/business/energy/us-shale-producer-eog-maintain-low-single-digit-oil-output-2022-08-05/.

[88] *What the End of the US Shale Revolution Would Mean for the World*, FINANCIAL TIMES, (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

(p) February 2023:

- Defendant Diamondback's CEO Stice said, "we have no reason to put growth before returns...we will continue to be disciplined."[89]

(q) March 2023:

- When asked why Occidental was not using its profits to "drill more wells" and "bring down prices," company CEO Hollub said that "prices are in a good place right now" and that Occidental had no intention of increasing production, despite having the ability to profitably increase production.[90]

95.   Within this context of high crude prices and ever-lowering breakeven prices, industry watchers questioned Defendants' refusal to compete for market share:

(r) February 2022:

- According to the Washington Post, the crude oil price increases following Russia's invasion should have been a "clear signal to raise [shale oil] production; we're talking Bat-signal clarity here."[91]

(s) February 2022:

- A Bloomberg article asked why Defendant EOG did not "take advantage of higher prices by pumping more crude from its shale fields," noting that EOG "plan[ned] to restrain oil growth this yar

[89] Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J., (Feb. 23, 2022) https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

[90] Ian Thomas, *U.S. Won't Reach a New Record in Oil Production 'Ever Again,' says Pioneer Natural Resources CEO*, CNBC.COM, (March 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

[91] Liam Denning, *Shale Companies Say They Can't Drill More. Even When There's a War?* BLOOMBERG, (Feb. 28, 2022), https://www.bloomberg.com/opinion/articles/2022-02-28/shale-companies-say-they-can-t-drill-more-even-when-there-s-a-war.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

despite surging prices, falling into line with most other major U.S. independent shale producers."[92]

(t) March 2022:

- A CNBC anchor said: "I know we keep hearing about this key code word from all the oil companies right now that they are 'disciplined,' but when you see oil north of 120 dollars a barrel, I mean it's one thing to be disciplined, it's another thing to miss an opportunity."[93]

(u) April 2023:

- Following another round of production cuts by OPEC, Bloomberg reported that the U.S. shale oil industry did not plan to "break a three-year trend" and increase production, despite being "flush" with profits," because "OPEC and shale are much more on the same team now, with supply discipline on both sides… [which]… really puts a floor under the price of oil long term."[94]

96.    Throughout 2022-2023, Defendants and OPEC continued to meet and communicate.

(v) March 2022:

- Defendants again met with OPEC during CERAWeek in Houston, Texas; Defendants and OPEC had "found themselves on similar sides

---

[92] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, Bloomberg, (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oil-production-growth-in-line-with-shale-peers.

[93] Pippa Stevens, *Oil Producers In a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC.COM, (March 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html.

[94] Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, Bloomberg, (April 3, 2023), https://www.bnnbloomberg.ca/don-t-expect-us-shale-to-quickly-fill-the-gap-left-by-opec-cut-1.1903965.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

as oil prices have surged well above $100 a barrel: no rush to rapidly boost production."[95]

(w) March 2023:

- U.S. shale oil executives, including Defendant Pioneer's Sheffield, Defendant Chesapeake's Nick Dell'Osso, Defendant Diamondback's Stice, Defendant Occidental's Hollub, and Defendant Hess's Hess, met with OPEC Secretary General-elect Haitham Al Ghais for a private dinner at which attendees reconfirmed their agreement to restrict production, "[d]espite recent record profits."[96]

97. Defendants made it clear in early 2023 that they were coordinating with OPEC.

(x) January 5, 2023:

- Defendant Pioneer's CEO Sheffield claimed that "OPEC ministers are frustrated over the recent price fall," and predicted that upcoming production was "going to change… . If [price] stays too low, it wouldn't surprise me if [OPEC] ha[s] another cut… . [W]e'll see that happens in the next 90 days."[97]

- In April 2023, OPEC "shocked traders around the world" by announcing a "surprise" production cut even though industry experts had "expected [OPEC] to stick to its already agreed 2m bpd cuts."[98]

---

[95] Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in No Rush to Resume Price War*, REUTERS, (March 10, 2022), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-us-shale-opec-no-rush-resume-price-war-2022-03-10/.

[96] *Oil Executives Warn Of Higher Prices Now That OPEC is Back 'In Charge,'* FINANCIAL TIMES, (March 7, 2023), https://www.ft.com/content/f1674a6e-39ae-4abb-ae2a-40fefb58d6b9.

[97] Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG, (April 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shale-executive-correctly-called-opec-s-surprise-output-cut.

[98] *OPEC+ Announces Surprise Cuts in Oil Production*, THE GUARDIAN, (April 2, 2023), https://www.theguardian.com/business/2023/apr/02/opec-announces-surprise-cuts-in-oil-production-of-about-115-mbpd.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

(y) March 27, 2023:

- In between Sheffield's prediction and OPEC's April 2023 announcement, some Defendants—including at least Defendant Pioneer and Defendant EOG—reportedly pulled back hedge positions they had previously taken to protect downward oil price movements, leaving them vulnerable and exposed substantial financial risk if oil prices declined.[99]

- Defendant Pioneer's CEO Sheffield doubled-down saying "we're not going to hedge" and that he was "optimistic that we'll see $100 a barrel before the end of the year."[100]

98. The only plausible and reasonable explanation for Defendants' failure to hedge is that they had advance notice of OPEC's April 2023 announcement of production cuts.

99. In April 2023, one industry analyst summarized the impact of Defendants' agreement to constrain crude oil production:

> In its early days, shale behaved like a dimmer, with output growth accelerating proportionally as oil prices were dialed up. That ability to respond quickly to the market was due to the speed at which shale wells could be developed: a few months compared to the years or decades of Big Oil projects. Today, shale is as responsive as in the past. But there's a difference. **The dimmer appears to be capped at a certain level: No matter how high oil prices go above that level – say $100 a barrel – the industry will no longer add rigs to sop up market share**. Rather, it will stay put and go into harvest mode with existing wells – that's exactly what happened in 2022, much to the consternation of the White House, which urged shale companies to drill more.[101]

100. As historical swing producers, in 2023 Defendants were able to increase crude oil

---

[99] *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FINANCIAL TIMES, (March 27, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.

[100] *Id.*

[101] Javier Blas, *Wall Street is Finally Going to Make Money off the Permian*, BLOOMBERG, (April 24, 2023), https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay-off (emphasis added).

production and grow their market share, but they simply chose not to. The only reasonable and plausible explanation for that choice is the conspiracy alleged herein.

101.    Defendants' agreement to restrict U.S. shale oil production achieved is intended and desired effect—*i.e.*, artificially inflating domestic crude oil prices in order to reap higher profits without investing in new production or otherwise acting to increase supply.

**H.    Defendants' Production Cuts Are Economically Irrational Absent Collusion**

102.    Defendants employed a variety of terms and phrases as code to conceal their agreement to restrict U.S. shale oil production, for example: discipline, focusing on value growth, staying in line. Defendants repeated public confirmation of their production "discipline" showed that they each had additional production capacity that they chose not to utilize.

103.    With oil prices far above each Defendant's "break-even" point, each Defendant had substantial economic incentives to pursue additional production because, in a competitive market, firms that decline profitable opportunities lose those opportunities to their competitors.

104.    So, if U.S. shale oil producers did not expand production, their competitors would, in a non-collusive market, take margin share and reinvest additional profits into further productive capacity and/or efficiency gains. Indeed, Defendants did this to OPEC during the above-described Shale Revolution and the OPEC Price War.

105.    The only economically rational reason any Defendant would choose to not increase production is if that Defendant knew that competitors would also choose to not increase production, and that such industry-wide restraint meant that that Defendant's market share would not be significantly impacted.

106.    Individually, no U.S. shale oil producer had market power sufficient to constrain overall U.S. shale oil production in a meaningful way. But together Defendants had substantial power in the domestic market—especially with respect to the swing production that had the most significant impact on global oil prices. Together, the Defendants could substantially constrain that swing production, and, as a result, they had negotiation power with OPEC, as well as insurance against competition from other significant swing producers.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

107.   In fact, the so-called "supermajors"[102] and many smaller independent oil producers had previously responded appropriately to these individual economic incentives. Supermajors had historically refrained from investing in fracking, viewing it as a smaller-scale enterprise difficult to integrate into their large-scale institutions. Yet in 2021 and 2022, in direct response to domestic shale producers "underinvesting as an industry," the supermajors began investing in shale oil at unprecedented rates.

108.   In 2022, ExxonMobil and Chevron planned on increasing their respective production levels in the Permian Basin by 25% and 10%. Mid-way through 2022, Chevron anticipated a 15% increase in shale oil production compared to 2021.

109.   In May 2023, ExxonMobil CEO Darren Woods said that the company planned to use new technologies aimed at doubling the volume of oil produced from domestic shale holdings.

110.   Smaller, private shale oil companies also took advantage of the high prices during this timeframe and expanded drilling. Benefiting from the production gap left by Defendants' production restrictions, these smaller producers "[led] output gains during the highest [crude oil] prices in seven years."[103]

111.   But small shale oil producers were limited in how fast they can add supply and increase production, and they were less able to scale up and operate multiple drilling projects simultaneously.

112.   Moreover, Defendants can effectively exploit their collective market power because conventional oil production in the United States is largely fixed and cannot quickly increase or decrease production in response to changing market dynamics in the short- to medium-term.

---

[102] The supermajors are BP, Chevron, Eni, ExxonMobil, Shell and Total Energies and are "the six largest publicly traded oil companies by revenue and political influence." *See* Jiarui Chen, et al., *How Much Have the Oil Supermajors Contributed to Climate Change?*, COLUMBIA CENTER ON SUSTAINABLE INVESTMENT, (March 2022), https://scholarship.law.columbia.edu/cgi/viewcontent.cgi?article=1219&context=sustainable_investment_staffpubs.

[103] Liz Hampton, *U.S. Shale Oil Forecasts Keep Rising As Smaller Producers Lead the Way*, REUTERS, (March 2, 2022), https://www.reuters.com/business/energy/us-shale-oil-forecasts-keep-rising-smaller-producers-lead-way-2022-03-02/.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

113.     When Defendants' production and capacity are combined with that of the OPEC and OPEC+ member countries, the resulting cartel formed by these entities controls approximately 60% of the total global oil production and ***nearly all*** total global oil production capable of quickly responding to price variations on a short-term basis.

## PLUS FACTORS

114.     The existence of the alleged conspiracy is also supported by "plus factors" that plausibly support the reasonable inference that Defendants' actions are the product of collusion and not pro-competitive, unilateral conduct.

115.     The United States shale oil industry is highly susceptible to collusion for reasons including common membership in trade associations that allow Defendants the opportunity to exchange competitive information; shale oil being a commodity; inelasticity in the demand for oil; and, the sanctioned cartelization of the global oil market through OPEC and OPEC+.

116.     Defendants have had many opportunities to collude. As discussed above, Defendants met collectively with top OPEC officials on numerous occasions during trade association meetings and large energy industry conferences. Public reports of these meetings include numerous acknowledgments from a variety of Defendants' corporate officers as well as OPEC leaders confirming that these meetings took place.

117.     As a daily-use commodity product, HHO has no substitute for most purchasers, and high switching costs for the remainder, leading to inelasticity of demand, enabling producers to extract higher prices from consumers who are unable to avoid price increases.[104]

## ANTITRUST INJURY

### A.     Defendants' Conspiracy Inflated the Price of Crude Oil

118.     The impact of U.S. shale oil production on crude oil prices is readily apparent. For example, the creation of OPEC+ in 2016 has been specifically linked as a response to the dramatic

---

[104] *See, e.g.*, Lutz Killian, *Understanding the Estimation of Oil Demand and Oil Supply Elasticities*, at 8, FED. RESERVE BANK OF DALLAS, (Sept. 2020), https://www.dallasfed.org/-/media/documents/research/papers/2020/wp2027.pdf, indicating that "the U.S. one-month price elasticity of oil supply is near zero."

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  fall in oil prices that was driven by the significant increases in U.S. shale oil production.[105] And

2  numerous sources have opined on this crude oil-shale oil relationship:

3      (z)  "OPEC's production decisions during the shale oil age…have been

4          particularly influenced by the evolving supply conditions in the

5          United States."[106]

6      (aa)  "It's easy to imagine that without the U.S. shale oil boom, oil

7          prices would have never dropped back below $100/bbl."[107]

8      (bb)  "(American) Shale production has also reduced the global price

9          of oil by 10 percent as of 2019."[108]

10     (cc)  "We find that oil prices in 2018 would have been roughly 36%

11         higher had the shale revolution not occurred."[109]

12     (dd)  "Since 2014, US shale oil has affected oil policies by increasing

13         global crude oil supply and influencing OPEC policies…."[110]

14 Defendants can wield their power over crude oil prices because of their roles as swing producers

15 in the global crude oil market—*i.e.*, they have sufficient market power to dictate when the United

[105] *What is OPEC+ and how it different from OPEC?*, EIA.GOV, (May 9, 2023), https://www.eia.gov/todayinenergy/detail.php?id=56420.

[106] https://www.ecb.europa.eu/pub/pdf/other/ebart201708_01.en.pdf (last accessed 1/31/24).

[107] Robert Rapier, *The U.S. Accounted for 98% of Global Oil Production Growth in 2018*, FORBES, (June 23, 2019), https://www.forbes.com/sites/rrapier/2019/06/23/the-u-s-accounted-for-98-of-global-oil-production-growth-in-2018/?sh=209c26df5125.

[108] *The Value of U.S. Energy Innovation and Policies Supporting the Shale Revolution*, THE COUNCIL OF ECONOMIC ADVISERS, (Oct. 2019), https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/10/The-Value-of-U.S.-Energy-Innovation-and-Policies-Supporting-the-Shale-Revolution.pdf.

[109] Nathan Balke, et al., *The Shale Revolution and the Dynamics of the Oil Market*, FED. RESERVE BANK OF DALLAS, (June 2020), https://www.dallasfed.org/-/media/documents/research/papers/2020/wp2021.pdf.

[110] Maitham Rodhan, *The Effect of US Shale Oil Production on Local and International Oil Markets*, INT. J. OF ENERGY ECON. AND POLICY, (June 21, 2023), https://econjournals.com/index.php/ijeep/article/view/14455/7412.

States can and will produce sufficient quantities of shale oil to "swing" the production of crude oil up and drive the prices of crude oil down.[111]

119.    Defendants have recognized that they wield this power. For example, in March 2022, the New York Times reported that, "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices… ."[112]

120.    Since at least January 1, 2021, despite high crude oil prices and healthy global demand (an environment conducive for an expansion of production by swing producers), Defendants have coordinated their production decisions, leading to lower growth rates than would otherwise obtain in a non-collusive market.

121.    Further, despite some non-conspiring independents increasing their shale oil production, Defendants' production restraints as key swing producers have still dramatically impacted overall U.S. shale oil production. In 2022, U.S. shale oil production increased at a rate 50% lower than what several market analysts had predicted.[113]

122.    The gap between the amount of U.S. shale oil that was *actually* produced and the amount of U.S. shale oil that *would have been produced* but for Defendants' conspiracy led to artificially inflated prices for crude oil which, in turn (as discussed further below), led to higher HHO prices.

/ / /

---

[111] Defendants are traditionally ranked in the top-10 domestic shale oil producers on a yearly basis. *See, e.g.*, *Leading Shale Oil Producers Based On Daily Average Crude Oil And Condensate Production In The United States In 2020*, STATISTA.COM, https://www.statista.com/statistics/1181897/oil-largest-shale-oil-producers/ (last accessed Feb. 8, 2024).

[112] Stanley Reed, *As Oil Soars, OPEC and its Allies Decline to Offer Relief*, N.Y. TIMES, (March 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html.

[113] Eric Rosenbaum, *Oil CEOs are Doubling Down on Buybacks as Biden Budget Seeks to Quadruple Tax*, CNBC.COM, (March 7, 2023), https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**Defendants' Conspiracy Caused Supracompetitive HHO Prices**

123. According to the U.S. Energy Information Administration ("EIA"), "[n]early all of the heating oil consumed in the United States is produced from crude oil."[114] Since heating oil is derived from crude oil, "the price of crude oil has a major effect on the price of heating oil."[115]

124. Prices paid for HHO by end users closely mirror the prices both for crude oil and gasoline sold in the United States, as reflected in the following graph:

**Figure 5: HHO vs. Gasoline vs. Crude Oil Spot Prices**[116]



125. As noted above, because crude oil is the primary raw material used to produce the HHO sold throughout the United States, the price of crude oil has a direct effect on the price of HHO. As a result, Defendants' conspiracy not only inflated the price of crude oil, but it also directly inflated the price of HHO sold in the United States during the Class Period, which, in turn, harmed

---

[114] *Heating Oil Explained*, EIA.GOV, (Oct. 19, 2023), https://www.eia.gov/energyexplained/heating-oil/.

[115] *Where is Heating Oil Most in Demand and Produced? (+Other Key Facts)*, COMMODITY.COM, (March 22, 2022), https://commodity.com/energy/heating-oil/.

[116] *Short-term Energy Outlook Data Browser*, EIA.GOV, https://www.eia.gov/outlooks/steo/data/browser/#/?v=8&f=A&s=0&start=2019&end=2025&maptype=0&ctype=linechart&linechart=&map= (last accessed Feb. 8, 2024).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    HHO purchasers like Plaintiff and the members of the proposed Classes who purchased HHO at

2    artificially inflated prices.

3    **CLASS ACTION ALLEGATIONS**

4    126.    Plaintiff brings this action individually and as a class action under Federal Rules of

5    Civil Procedure 23(a), (b)(1) and (b)(2) as representatives of a class of indirect purchasers seeking

6    injunctive relief (the "Nationwide Class") defined as follows:

7
> All persons or entities who purchased, for their own use and not for
> resale, home heating oil in the United States from January 1, 2021,

8
> until the Defendants' unlawful conduct and its anticompetitive effects
> cease to persist.

9

10    127.    In addition, Plaintiff bring this action individually and as a class action under Federal

11    Rules of Civil Procedure 23(a) and (b)(3) as representatives of a class of indirect purchasers seeking

12    damages and equitable relief on behalf of the following classes (the "State Law Class"):

13
> All persons or entities who purchased, for their own use and not for
> resale, home heating oil in Connecticut from January 1, 2021, until

14
> the Defendants' unlawful conduct and its anticompetitive effects
> cease to persist.

15    128.    Excluded from the Nationwide Class and the State Law Class are Defendants, their

16    parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any

17    judges or justices assigned to hear any aspect of this action.

18    129.    Plaintiff reserves the right to modify these definitions and/or to propose subclasses,

19    as appropriate, based on further investigation and discovery.

20    130.    *Numerosity*. The members of the Nationwide Class and the State Law Class are so

21    numerous as to render their individual joinder impracticable. Although the precise number of

22    Nationwide Class and the State Law Class members is unknown, based upon information and belief

23    Plaintiff alleges that the Nationwide Class and the State Law Class contain hundreds of thousands,

24    if not millions, of members geographically dispersed throughout the United States.

25    131.    *Commonality and Predominance.* Common questions of law and fact exist as to all

26    members of the Nationwide Class and the State Law Class, and such questions predominate over

27    any question affecting only individual members of the Nationwide Class and the State Law Class. The

28    common legal and factual questions, each of which also may be certified under Rule 23(c)(4),

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

include but are not limited to the following:

(ee)    Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to restrain trade by fixing, raising, maintaining, or stabilizing prices of shale and crude oil, and, thus, HHO, in the United States;

(ff)    The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(gg)    Whether the alleged conspiracy violated antitrust laws, unfair competition laws and/or consumer protection laws;

(hh)    Whether the conduct of Defendants and their co-conspirators, caused Plaintiff and members of Nationwide Class and the State Law Class to suffer an injury;

(ii)    Whether the conduct of Defendants and their co-conspirators caused the prices for HHO sold in the United States to be higher than they would have been in a competitive market;

(jj)    Whether Plaintiff and other members of the Nationwide Class and the State Law Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

(kk)    Whether Defendants undertook actions to conceal their unlawful conspiracy; and

(ll)    The appropriate class-wide measure of any damages.

132.    These and other questions of law or fact which are common to the members of the Nationwide Class and the State Law Class predominate over any questions affecting only individual members of the Classes.

133.    *Typicality*.  Plaintiff's claims are typical of the claims of the members of the Nationwide Class and the State Law Class because their claims arise from the same course of conduct by Defendants, and the relief sought within the Nationwide Class and the State Law Class is similar as to each member.

134.    *Adequacy of Representation*.  Plaintiff will fairly and adequately protect the interests of the Nationwide Class and the State Law Class.  Plaintiff has retained trial counsel highly

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    experienced in complex litigation including complex antitrust class action litigation, and Plaintiff

2    intends to vigorously prosecute this action. Plaintiff has no interest in this action that is adverse or

3    antagonistic to the interests of the Nationwide Class and the State Law Class.

4         135.   ***Superiority***. A class action is superior to other available methods for the fair and

5    efficient adjudication of this controversy. The prosecution of separate actions by individual members

6    of the Nationwide Class and the State Law Class would impose heavy burdens on the Court and

7    Defendants and would create a risk of inconsistent or varying adjudications of the questions of law

8    and fact common to the Nationwide Class and the State Law Class. A class action, on the other hand,

9    would achieve substantial economies of time, effort, and expense, and would assure uniformity of

10   decision as to persons similarly situated without sacrificing procedural fairness or bringing about

11   other undesirable results. Absent a class action, it would not be practicable for the members of the

12   Nationwide Class and State Law Class to seek redress for the violations of law alleged herein.

13        136.   Furthermore, the Nationwide Class and the State Law Class may be certified under

14   Rule 23(b)(2) because Defendants have acted (and continue to act) on grounds generally applicable

15   to the Class, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

### CLAIMS FOR RELIEF

**A.    VIOLATION OF THE SHERMAN ACT**

#### COUNT I

**VIOLATION OF 15 U.S.C. § 1**

**(On Behalf of the Nationwide Injunctive Relief Class)**

21        137.   Plaintiff incorporates by reference paragraphs 1 through 136 as if fully set forth

22   herein.

23        138.   The purpose of the Sherman Act is to preserve free and unfettered competition in the

24   marketplace.

25        139.   Defendants and their co-conspirators entered into and engaged in a contract,

26   combination or conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C.

27   § 1.

28        140.   From at least January 1, 2021, and continuing through the present, the exact dates

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for crude oil, and, in turn, HHO, in the United States, including by restraining production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

141.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate trade or commerce by causing prices for crude oil and, in turn, HHO, to be higher than they otherwise would be in a competitive market.

142.    As a result of Defendants' unlawful conduct, Plaintiff and the members of the Classes have been harmed by paying inflated prices for HHO.

143.    In formulating and carrying out the alleged agreement or understanding to restrain trade, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

144.    Price competition in the sale of crude oil, and, in turn, HHO have been restrained, suppressed, and/or eliminated in the United States;

145.    Prices for crude oil sold by Defendants and all of their co-conspirators have been fixed, raised, maintained and/or stabilized at artificially high, noncompetitive levels throughout the United States; and,

146.    Plaintiff and members of the Classes who purchased HHO, for their own use and not for resale, have been deprived of the benefits of free and open competition, and paid artificially high prices for HHO.

147.    Defendants took all the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of crude oil, and, in turn, HHO to be higher than they would be but for Defendants' conduct.

148.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Classes have been injured and will continue to be injured by paying more for HHO than they would have paid, and will pay, in the absence of the conspiracy.

149.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

antitrust laws.

**B.    VIOLATION OF STATE ANTITRUST, UNFAIR COMPETITION, AND CONSUMER PROTECTION LAWS**

150.    Plaintiff re-alleges and incorporate by reference paragraphs 1 through 136 as if fully set forth herein.

151.    During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil, and, in turn, HHO in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust, unfair competition and consumer protection laws set forth below.

152.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, and, in turn, HHO, which injured Plaintiff and members of the Classes.

153.    Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiff and members of the State Law Class were deprived of free and open competition and paid more to purchase HHO than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust, unfair competition and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

154.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiff and members of the Classes.

155.    Accordingly, Plaintiff and the members of the State Law Class seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  under Connecticut law, injunction (where applicable), and costs of suit, including reasonable

2  attorneys' fees, to the extent permitted by Connecticut law.

3      156.    Defendants' anticompetitive acts described above were knowing and willful and

4  constitute violations of the following state antitrust, unfair competition, and consumer protection

5  statutes.

6      157.    In the Counts that follow, a reference to the "Class" is a reference to a State Law

7  Class unless otherwise specified.

8  **COUNT 2 VIOLATION OF CONNECTICUT GENERAL STATUE 35-24 ET SEQ.**

9  **(On Behalf of Members of the State Law Class That Purchased HHO in Connecticut)**

10     158.    Defendants have entered into an unlawful agreement in restraint of trade in violation

11  of Conn. Gen. Stat. §35-24 *et seq*. Defendants' combinations or conspiracies had the following

12  effects: (1) price competition for crude oil and HHO was restrained, suppressed, and eliminated

13  throughout Connecticut, and (2) HHO prices in the State of Connecticut were fixed, controlled, and

14  maintained at artificially high levels; and (3) individuals have been deprived of free and open

15  competition.

16     159.    During the Class Period, Defendants' illegal conduct substantially affected

17  Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in

18  restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*.

19     160.    Accordingly, Plaintiff and members of the Class have been injured and seek all forms

20  of relief available under Conn. Gen. Stat. §35-24 *et seq.*

21  **PRAYER FOR RELIEF**

22  **WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, request

23  relief and pray for judgment against Defendants as follows:

24     A.      An Order certifying the Classes under the appropriate provisions of Rule 23 (b)(2)

25  and (b)(3) of the Federal Rule of Civil Procedure;

26     B.      An Order appointing Plaintiff as a Class representative and appointing his counsel

27  as Class Counsel;

28     C.      A Declaration that Defendants' actions, as set forth above, are unlawful and in

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  violation of the Sherman Act;

2       D.     An award to Plaintiff and the Classes for their costs of suit, including reasonable

3  attorneys' fees and expenses;

4       E.     A Judgment against Defendants, jointly and severally, and in favor of Plaintiff and

5  members of the State Law Class for treble the amount of damages sustained by Plaintiff and the

6  State Law Class as allowed by law, together with costs of the action, including reasonable

7  attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of

8  service of this Complaint to the extent provided by law; and

9       F.     An award of such other relief as the Court may deem just and proper.

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1

## <u>DEMAND FOR JURY TRIAL</u>

2

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

3

Procedure, of all issues so triable.

4

5     DATED: February 12, 2024       **LAW OFFICE OF ANDREW M. LEAVITT, ESQ**

6

7

8

By:          */s/ Robert F. Purdy*
9                        ROBERT F. PURDY

10           ROBERT F. PURDY, ESQ. (NV Bar No. 6097)

11            robert.purdy@andrewleavittlaw.com
          **LAW OFFICE OF ANDREW M. LEAVITT, ESQ.**
12           633 South 7th Street
          Las Vegas, NV 89101
13           Telephone:     (702) 382-2800
          Facsimile:      (702) 382-7438
14

15           DANIEL L. WARSHAW (Pro Hac Vice Forthcoming)
           dwarshaw@pwfirm.com
16           BOBBY POUYA (Pro Hac Vice Forthcoming)
           bpouya@pwfirm.com
17           **PEARSON WARSHAW, LLP**
          15165 Ventura Boulevard, Suite 400
18           Sherman Oaks, California 91403
          Telephone: (818) 788-8300
19           Facsimile:  (818) 788-8104

20           JILL M. MANNING (Bar No. 178849)
21            jmanning@pwfirm.com
          NEIL J. SWARTZBERG (Bar No. 215133)
22            nswartzberg@pwfirm.com
          **PEARSON WARSHAW, LLP**
23           555 Montgomery St., Suite 1205
24           San Francisco, California 94111
          Telephone: (415) 433-9000
25           Facsimile:  (415) 433-9008

26

          *Attorneys for Plaintiff and the Proposed Class*
27

28

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403